**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **KRISTOFER L. PRUSIN,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **CIVIL NO. JKB-16-0605** |
| **CANTON'S PEARLS, LLC,** et al., | * | |
| **Defendants.** | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Kristofer Prusin ("Plaintiff") filed suit against Canton's Pearls, LLC, and Eric K. Hamilton ("Defendants"), alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §201, *et seq.*, the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann. Labor & Emp't § 3-401, *et seq.*, and the Maryland Wage Payments and Collection Law ("MWPCL"), Md. Code Ann. Labor & Emp't § 3-501, *et seq.* Now pending before the Court is Plaintiff's Motion for Partial Summary Judgment. (ECF No. 71.) The issues have been briefed (ECF Nos. 71, 77, & 84), and no hearing is required, Local Rule 105.6 (D. Md. 2016). For the reasons explained below, Plaintiff's motion will be GRANTED IN PART and DENIED IN PART.

## I.    *Background*

Plaintiff previously worked as a server at Canton Dockside, a restaurant and crab house operated by Defendants. He was employed in that position from April 2013 through October 2015. (ECF No. 71, Ex. 1, Prusin Affidavit ¶ 1.) Before working as a server, Plaintiff worked in the kitchen as a cook for approximately two years. (*Id.*) Defendant Eric Hamilton was the General Manager of Canton Dockside from its opening in 2004 through his resignation in May

2015.  (ECF No. 71, Ex. 5 at 10.)  He also has a five percent ownership stake in Defendant Canton's Pearls LLC, the corporate entity that controls Canton Dockside.  (ECF No. 77, Exs. 17, 18, & 19.)  However, Canton Dockside was co-managed by Defendant Hamilton and Timothy Mitchell during most of Plaintiff's tenure.[1]  (ECF No. 71, Ex. 5, Hamilton Dep. at 42; *id.*, Ex. 8, Dr. Earl Hamilton Dep. at 10.)  Defendant Hamilton and Mitchell, as well as Hamilton's father, Dr. Earl Hamilton, who is the majority owner of Canton's Pearls LLC, each had authority to hire employees.  (ECF No. 71, Ex. 5, at 49–50; ECF No. 71, Ex. 4, Mitchell Dep. at 15.)  However, Mitchell did not fire employees without approval from Defendant Hamilton or Dr. Hamilton.  (ECF No. 71, Ex. 4 at 16.)  Additionally, Defendant Hamilton had authority to set and adjust employee compensation, including his own, without approval from Dr. Hamilton.  (ECF No. 71. Ex. 8, at 25.)

Plaintiff was paid an hourly wage of $3.63 plus voluntary tips and mandatory gratuities paid by customers.[2]  Plaintiff was not compensated at a different rate for overtime hours. Defendants did not have any written policies addressing server wages, but instead orally informed servers upon hire of their base pay and their obligation to share a percentage of their tips and mandatory gratuities with bussers and bartenders.  At the end of each shift, servers were given one-hundred percent of their tips and mandatory gratuities in cash—regardless of whether the customer paid by cash or credit card—less the amount they were required to tip-out to

---

[1]    Hamilton and Mitchell previously worked together as servers and shift managers at another local restaurant, Seaside.  Canton Dockside was originally a joint venture between the Hamiltons and the former owners of Seaside, Edward Snyder and Vernon Martin.  However, Earl Hamilton bought out Snyder and Martin soon after Canton Dockside opened.

[2]    Defendant Canton imposed a mandatory 15% gratuity on all customers' checks.  Servers, however, could choose not to include this charge and instead rely on voluntary tips from customers.

bussers and bartenders.[3]  (ECF No. 71, Ex. 4, at 11–14.)  Canton Dockside also deducted a credit card processing fee (which varied from credit card to credit card) from servers' tips and mandatory gratuities for all payments made by credit card.  (*Id.* at 13–14.)

Defendants maintained records of all tips and mandatory gratuities, regardless of whether they were paid by cash or credit card.  These records were logged in a Daily System Sales Detail ("DSSD") report every day, which tracked sales information for the restaurant.  (ECF No. 77, Ex. E, Ottey Dep. at 22–23.)  In addition to tracking food and beverage sales, each DSSD report included line items labeled "Service Charge" and "Charge Tips," which represented mandatory gratuities and voluntary tips respectively.  (ECF No. 77, Ex. F, DSSD Report, ECF No. 71, Ex. 6, Ottey Dep. at 125.)  These line items were combined in a category labeled "Total Tips," which represented the total voluntary tips and mandatory gratuities received in a given day.  (ECF No. 77, Ex. G, Ottey Dep. at 125.)  The DSSD reports also included a line item labeled "Tips Paid," which represented the total tips paid out to servers, who in turn dispersed the appropriate amount to bussers and bartenders.  (*Id.*)

Defendants' accountant used the DSSD reports to produce aggregated Profit & Loss ("P&L") statements for each year.  (ECF No. 71, Ex. 6, at 116–121.)  The yearly P&L statements included a line item labeled "Total Sales," which matched the amount Defendants reported as their "[g]ross receipts or sales" on their Form 1065 used to report partnership income to the Internal Revenue Service.  (*Id.* at 118.)  Included within the total sales on the P&L statements was a category labeled "Tip Clearing."  (ECF No. 77, Ex. G, at 123.)  The "Tip Clearing" category on the P&L statements represented only the portion of voluntary tips and mandatory gratuities that were retained by the restaurant to cover credit card processing fees.  (ECF No. 71,

---

[3]      Servers were required to give bussers thirteen percent of their tips and bartenders five percent of their beer, wine, and liquor sales.  (ECF No. 71, Ex. 3, Corp. Designee Dep. at 41.)

Ex. 6, Ottey Corp. Designee Dep. at 134; ECF No. 77, Ex. G, at 128–30.)  Defendants did not

otherwise record voluntary tips and mandatory gratuities in either the income or expense side of

their P&L statements.  (ECF No. 77, Ex. G, at 127–31.)

## II.    Standard for Summary Judgment

A party seeking summary judgment must show "that there is no genuine dispute as to any

material fact" and that he is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

burden is on the moving party to demonstrate the absence of any genuine dispute of material

fact.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  If a party carries this burden, then

the court will award summary judgment unless the opposing party can identify specific facts,

beyond the allegations or denials in the pleadings, that show a genuine issue for trial.  Fed. R.

Civ. P. 56(e)(2).  If sufficient evidence exists for a reasonable jury to render a verdict in favor of

the party opposing the motion, then a genuine dispute of material fact is presented and summary

judgment should be denied.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The

existence of only a "scintilla of evidence" is not enough to defeat a motion for summary

judgment.  *Id.* at 251.  To carry these respective burdens, each party must support its assertions

by citing specific evidence from the record.  Fed. R. Civ. P. 56(c)(1)(A).  The court will assess

the merits of the motion, and any responses, viewing all facts and reasonable inferences in the

light most favorable to the party opposing the motion.  *Scott v. Harris*, 550 U.S. 372, 378 (2007);

*Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

## III.   Analysis

On March 3, 2016, Plaintiff filed this lawsuit alleging that Defendants violated the FLSA,

the MWHL, and the MWPCL by failing to pay him minimum wage and overtime pay.  Plaintiff

filed a motion for partial summary judgment pursuant to Federal Rule of Civil Procedure 56

seeking judgment as a matter of law that Defendants failed to pay Plaintiff minimum and overtime wages as required by the FLSA and MWHL. Specifically, Plaintiff contends that:

1. Defendants are not eligible to claim a "tip credit" under 29 U.S.C. § 203(m) because they failed to provide adequate notice to Plaintiff prior to taking the credit; and

2. Defendants cannot rely on the mandatory gratuities retained by Plaintiff to satisfy their minimum and overtime wage obligations because the mandatory gratuities did not become part of Canton Dockside's gross receipts and therefore do not qualify as service charges under the FLSA.

Plaintiff seeks $19,165.06 in unpaid minimum wage and overtime compensation, plus an equal amount in liquidated damages. Additionally, Plaintiff contends that Eric Hamilton qualifies as an employer under the FLSA as a matter of law and therefore is jointly and severally liable along with Canton's Pearls LLC for any violations of the FLSA and MWHL.

### A. Counts I & IV:  FLSA and MWHL Minimum Wage Violations

Plaintiff's claim in Counts I and IV is that Defendants failed to pay him the minimum wage required by the FLSA and MWHL. 29 U.S.C. §§ 206(a), 215(a)(2); Md. Code Ann., Labor & Emp't, § 3-413. In response, Defendants contend that they satisfied their minimum wage obligations because they were entitled to take a "tip credit" under the FLSA and MWHL. 29 U.S.C. § 203(m); Md. Code Ann., Labor & Emp't § 3–419(a)(1)(ii); *Gionfriddo v. Jason Zink, LLC*, 769 F. Supp. 2d 880, 893 (D. Md. 2011). Alternatively, Defendants contend that even if they were not entitled to claim a tip credit, the mandatory gratuities received by Plaintiff may be used to offset their minimum-wage liability.

### 1. The Tip Credit Provision

"The FLSA requires covered employers to pay 'nonexempt employees' a minimum wage for each hour worked, 29 U.S.C. § 206(a), but allows employers to pay less than the minimum wage to employees who receive tips, 29 U.S.C. § 203(m)." *Dorsey v. TGT Consulting, LLC*, 888

F. Supp. 2d 670, 680 (D. Md. 2012). "Tipped employees . . . are required to receive at least the minimum wage, but their employers are permitted to pay a direct wage of $2.13 per hour and then take a 'tip credit' to meet the $7.25 per hour minimum wage requirement." *Gionfriddo*, 769 F. Supp. 2d at 893. The tip credit, in essence, allows employers to credit employees' tips against the employer's minimum wage obligations. *See id.*

In order to obtain the benefit of this credit, however, employers must satisfy two fundamental requirements. Section 203(m) provides that an employer may not take a tip credit with regard to an employee's wages unless (1) "such employee has been informed by the employer of the provisions of this subsection" and (2) "all tips received by such employee have been retained by the employee." 29 U.S.C. § 203(m); *accord Dorsey*, 888 F. Supp. 2d at 680–81. These two requirements are "'strictly construed,' and 'must be satisfied even if the employee received tips at least equivalent to the minimum wage.'"[4] *Dorsey*, 888 F. Supp. 2d at 681 (quoting *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 287 (S.D.N.Y. 2011)).

> What the Congress has said, in effect, to restaurant employers is that, if you precisely follow the language of 3(m) and fully inform your employees of it, you may obtain a 50 percent credit from the receipt of tips toward your obligation to pay the minimum wage. The corollary seems obvious and unavoidable: if the employer does not follow the command of the statute, he gets no credit.

*Richard v. Marriott Corp.*, 549 F.2d 303, 305 (4th Cir. 1977).

The employer "bear[s] the burden of showing that [it] satisfied the FLSA's notice requirement by, for example, providing employees with a copy of § 203(m) and informing them that their tips will be used as a credit against the minimum wage as permitted by law." *Inclan v.*

---

[4]    *Martin v. Tango's Rest., Inc.*, 969 F.2d 1319, 1323 (1st Cir.1992) ("It may at first seem odd to award back pay against an employer, doubled by liquidated damages, where the employee has actually received and retained base wages and tips that together amply satisfy the minimum wage requirements. Yet Congress has in section 3(m) expressly required notice as a condition of the tip credit...."); *Chung v. New Silver Palace Rest., Inc.*, 246 F. Supp. 2d 220, 229 (S.D.N.Y. 2002) ("The two prerequisites that the employer must fulfill to be eligible for the tip credit are strictly construed, and must be satisfied even if the employee received tips at least equivalent to the minimum wage.").

*N.Y. Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 497 (S.D.N.Y. 2015) (alterations in original). "Although an employer need not 'explain' the tip credit to an employee, Courts have widely interpreted section 203(m) to require at a minimum that an employer inform its employees of its intention to treat tips as satisfying part of the employer's minimum wage obligations." *Bernal v. Vankar Enters., Inc.*, 579 F. Supp. 2d 804, 809 (W.D. Tex. 2008) (collecting cases). It is not sufficient that employees "be *aware of* the tip credit provisions." *Pedigo v. Austin Rumba, Inc.*, 722 F. Supp. 2d 714, 724 (W.D. Tex. 2010). "Rather, section 203(m) affirmatively requires employers to *inform* employees of the provisions contained in section 203(m)." *Id.* Accordingly, because it is the employer's burden to prove it complied with the tip credit notice requirement, the employer must "adduce definite, competent evidence showing that waiters were informed of the tip credit." *Perez v. Lorraine Enterprises, Inc.*, 769 F.3d 23, 30 (1st Cir. 2014).[5]

---

[5]     In 2011, the Department of Labor promulgated a final regulation which further clarifies the tip-credit notice requirements. Specifically, the regulation states that an employer is not eligible for the tip credit unless it has informed its tipped employees of the following:

> (1)  The amount of the cash wage that is to be paid to the tipped employee by the employer;

> (2)  [T]he additional amount by which the wages of the tipped employee are increased on account of the tip credit claimed by the employer, which amount may not exceed the value of the tips actually received by the employee;

> (3)  [T]hat all tips received by the tipped employee must be retained by the employee except for a valid tip pooling arrangement limited to employees who customarily and regularly receive tips; and

> (4)  [T]hat the tip credit shall not apply to any employee who has not been informed of these requirements in this section.

29 C.F.R. § 531.59. The regulation "includes a more detailed notice requirement than courts had previously mandated" by requiring that employers not only "'allow the employee to retain all tips he or she received[,]' . . . . [but] also *inform* employees of the requirement that they must be allowed to retain all of the tips." *Dorsey*, 888 F. Supp. 2d at 682 (citation omitted) (quoting *Arencibia v. 2401 Rest. Corp.*, 831 F. Supp. 2d 164, 175 (D.D.C. 2011)). At least one federal district court has heard and rejected a challenge to the final regulation under the Administrative Procedure Act. *Nat'l Rest. Ass'n v. Solis*, 870 F. Supp. 2d 42, 59 (D.D.C. 2012) (holding that tip credit regulation promulgated by DOL is not arbitrary and capricious). Here, the Court need not consider the heightened requirements under the regulations promulgated by DOL because Defendants have failed to present a genuine dispute of material fact regarding their compliance with even the most basic notice requirement under the plain language of the statute.

The MWHL, like the FLSA, requires that an employer provide notice to an employee before claiming a tip credit as to the employee's wages.  Further, the language of the MWHL notice provision is nearly identical to that of the FLSA.  *Compare* 29 U.S.C. § 203(m) ("[The tip credit provision of the FLSA] shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection."), *with* Md. Code Ann., Labor & Emp't § 3–419(a)(1)(ii) ("This section applies to each employee who has been informed by the employer about the provisions of this section.").  Thus, the analysis of Defendants' entitlement to claim the tip credit is the same under the FLSA and MWHL.

Here, Defendants fail to point to any evidence in support of their claim that they provided Plaintiff notification of the tip credit.  Defendants rely entirely on their display of "labor law posters" in the restaurant during Plaintiff's employment and one offhand comment by Defendant Hamilton during his deposition testimony.  The Court first turns to the posters.  Assuming *arguendo* that the posters were displayed during the relevant period, and that displaying a poster with language that tracks the tip credit provisions of the FLSA and MWHL is alone sufficient to satisfy the statutory notice requirement,[6] Defendants have still failed to present a genuine issue

---

[6]     Although the Court is left to guess at what notices were included on the poster, many courts have rejected arguments that language included on a DOL poster is alone sufficient to satisfy the FLSA's tip credit notice requirements.  *See, e.g.*, *Hernandez v. Jrpac Inc.*, No. 14 CIV. 4176 (PAE), 2016 WL 3248493, at *24 (S.D.N.Y. June 9, 2016) (holding that employer failed to satisfy tip-credit notice requirements and noting that "even had a DOL poster been prominently displayed in the workplace, [the employer's] notification to the delivery workers merely that they would earn certain wages plus tips, without more, would not satisfy the FLSA's notice provision for taking a tip credit"); *Driver v. AppleIllinois, LLC*, 917 F. Supp. 2d 793, 803 (N.D. Ill. 2013) (holding that DOL posters which described the FLSA tip credit did not satisfy the statute's notice requirement because the "posters . . . do not inform the employee that [the employer] intends to claim the tip credit against *its* minimum wage obligation"); *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 289–90 (S.D.N.Y. 2011) ("A generic government poster could inform employees that minimum wage obligations exist, but could not possibly inform employees that their employers intend to take the tip credit with respect to their salary."); *see also Copantitla*, 788 F. Supp. 2d at 290 n.15 ("The regulation requiring the posted notice, 29 C.F.R. § 516.4, addresses a broader responsibility of the employer to inform employees of the minimum wage provisions more generally, as opposed to the tip-credit notice requirement, which deals more specifically with the provisions of 29 U.S.C. § 203.").

of material fact.   Defendants contend merely that they received a "labor law poster" from Paychex once a year, which they posted in an area that was "conspicuous to all employees, including servers."  (ECF No. 77 at 5.)  However, Defendants have not identified any relevant language (or for that matter any language at all) on these posters that would satisfy the tip credit notice requirement.  When asked whether he had "ever stopped and actually read" the poster, Defendant Hamilton responded, "I would probably have to say no."  (ECF No. 77, Ex. A, Def. Hamilton Dep. at 215.)  Similarly, all Mitchell could remember about the poster is that "[i]t talks about like if you are pregnant and go on maternity leave and that kind of stuff. It is pretty big." (*Id.*, Ex. B, Mitchell Corp. Designee Dep., at 48.)  And although Defendants attached a picture of the poster to their motion, it is taken from a distance that makes it completely illegible, thereby depriving the Court of any opportunity to independently review the poster and determine whether it includes language that could satisfy the notice requirement.  Without more the Court is left to guess at what the poster did or did not say about "labor law."

Defendants also suggest that Defendant Hamilton orally informed Plaintiff of the tip credit notice requirements when he trained Plaintiff to work as a server.  Again, Defendants fail to identify specific facts in the record sufficient to give rise to a genuine dispute.  Defendant Hamilton testified that when Plaintiff moved from the kitchen to serving tables he told Plaintiff "he would be going from whatever he was making as cook down to here (indicating), but that tips and service charge[s] and everything would cover, and he would be making more money, which was absolutely the case."  (ECF No. 77, Ex. A, at 136–37.)  Conspicuously absent from this statement, and indeed all of Defendants' deposition testimony, is any suggestion that Defendants "*inform[ed]*" Plaintiff "of the provisions contained in section 203(m)" *Pedigo*, 722 F. Supp. 2d at 724, or of their "intention to treat tips as satisfying part of [their] minimum wage

obligations," *Bernal*, 579 F. Supp. 2d at 809.  To the contrary, Mitchell, who co-managed Canton Dockside for the entirety of Plaintiff's employment and who, according to Defendant Hamilton, was responsible for "doing everything with regards to pay," repeatedly testified that he had never informed an employee of any of the tip credit notice requirements.

> Q:  Have you ever sat down and told a tipped employee anything about the tip credit . . . ?
>
> A:  No.
>
> . . .
>
> Q:  Have you ever told a tipped employee that they are entitled to retain all of their tips except pursuant to a valid tip pool arrangement?
>
> A:  No.
>
> Q:  Have you ever instructed a front of the house manager to tell tipped employees that they are entitled to retain all of their tips except pursuant to a valid tip pool arrangement?
>
> A:  No.
>
> Q:  [D]id you ever tell tipped employees the exact amount of the tip credit under Federal and/or State Law?
>
> A:  No.
>
> Q:  Did you ever instruct any managers to tell any tipped employees about the exact amount of the tip credit under Federal and/or State Law?
>
> A:  No.
>
> Q:  Did Eric Hamilton ever instruct you to advise tipped employees of the amount of the tip credit being taken under Federal and/or State Law?
>
> A:  No."

(ECF No. 71, Ex. 3, Mitchell Corp. Designee Dep., at 42, 44–45.)

In short, even viewing the facts in the light most favorable to Defendants, the nonmoving party, the Court concludes that no reasonable jury could find that Defendants informed Plaintiff

of the FLSA's tip credit provisions.  Given that the MWHL is the state parallel of the FLSA, the Court likewise concludes that Defendants also failed to satisfy the MWHL's tip credit notice requirements.  Accordingly, Defendants are not entitled to claim a tip credit as a matter of law.

### 2.  Service Charges

Alternatively, Defendants contend that the mandatory gratuities received by Plaintiff qualify as service charges—not tips—under the FLSA.  This distinction is important.  If the mandatory gratuities are service charges Defendants are entitled to offset the full amount of the charge against their minimum wage liability and need not show that they complied with the tip credit notice provisions.  If they are tips, however, Defendants may not use any portion of them to satisfy their minimum wage obligations because, as explained *supra*, Defendants did not satisfy the tip-credit notice requirements.

According to DOL regulations implementing the FLSA, a "tip" is "a sum presented by a customer as a gift or gratuity in recognition of some service performed for him."  29 C.F.R. § 531.52.  By contrast, a "service charge" is a "compulsory charge for service . . . imposed on a customer by an employer's establishment."  29 C.F.R. § 531.55(a).  The DOL's regulations provide that "service charges and other similar sums *which become part of the employer's gross receipts* are not tips for the purposes of the Act.  Where such sums are distributed by the employer to its employees, however, they may be used in their entirety to satisfy the monetary requirements of the Act."  29 C.F.R. § 531.55(b).

"[A]t least two prerequisites" must be satisfied in order "to count[] 'service charges' as an offset to an employer's minimum-wage liability.  The service charge [1] 'must have been included in the establishment's gross receipts,' and [2] it must have been 'distributed by the employer to its employees.'"  *McFeeley v. Jackson St. Entm't, LLC*, 825 F.3d 235, 246 (4th Cir.

2016) (citations omitted) (first quoting *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 929 (S.D.N.Y. 2013), then quoting 29 C.F.R. § 531.55(b))); *see also Henderson v. 1400 Northside Drive, Inc.*, 110 F. Supp. 3d 1318, 1322 (N.D. Ga. 2015) ("[A]t minimum, for a fee to constitute a 'service charge,' it must be (1) recorded in a company's gross receipts, and (2) distributed by the company to the employee."); *Hart*, 967 F. Supp. 2d at 929 (stating that the "critical issue" is whether employer recorded charges in its gross receipts); *Reich v. ABC/York-Estes Corp.*, No. 90-cv-6265, 1997 WL 264379, at *5 (N.D. Ill. May 12, 1997) ("[A]n employer must include payments in its records *as gross receipts* as a prerequisite to 'service charge' classification under the FLSA" (emphasis added)).

"[T]he employer bears the burden of proving entitlement to any exemptions or exceptions to the Act's compensation requirements," including entitlement to credit service charges against its wage obligations. *Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999); *see also Reich v. ABC/York-Estes Corp.*, 157 F.R.D. 668, 680 (N.D. Ill. 1994) ("[T]he employer bears the burden of proving that it is entitled to the service charge credit."), *rev'd in part on other grounds*, 64 F.3d 316 (7th Cir. 1995).

The parties generally agree on the relevant law as outlined above. In particular, they agree that in order to qualify as service charges for purposes of the FLSA, the mandatory gratuities must have become part of Canton Dockside's gross receipts and been distributed by Canton Dockside to Plaintiff. The parties, however, dispute what constitutes inclusion in gross receipts for purposes of the FLSA. Plaintiff contends that in order to use mandatory gratuities to offset their minimum wage obligations, Defendants must show that Canton Dockside treated the charges like other forms of business income and distributed them to employees like other wages. According to Plaintiff, at a minimum, this means that Defendants must have recorded and

reported mandatory gratuities as gross receipts for accounting and tax purposes. In other words, if Defendants did not treat the mandatory gratuities as gross receipts for accounting and tax purposes then they are not in fact service charges for purposes of the FLSA. Defendants counter that they tracked and recorded all mandatory gratuities paid by customers and received by employees. They contend that nothing more is required.

The weight of authority supports Plaintiff's position. First, simply keeping a record of mandatory gratuities is not sufficient to qualify for the offset; rather, they must be recorded as gross receipts of the employer. *See Gardner v. Country Club, Inc.*, No. 4:13-CV-03399-BHH, 2015 WL 7783556, at *20 (D.S.C. Dec. 3, 2015) ("[W]hat matters is not just whether the defendant recorded the amount of money received in service charges, but whether that money was treated as having been received by [Defendant] for accounting purposes, tax purposes, etc." (citing *Hart*, 967 F. Supp. at 929–30)); *Henderson*, 110 F. Supp. 3d at 1322 ("[A]t minimum, for a fee to constitute a 'service charge,' it must be (1) recorded in a company's gross receipts . . . ."); *ABC/York-Estes Corp.*, 1997 WL 264379, at *7 (finding that mandatory fees paid to exotic dancers were not service charges under the FLSA in part because "there [wa]s no indication in the record that the table dance fees [we]re reported in defendants' gross receipts").

Moreover, mandatory gratuities do not qualify as service charges when only a portion of them become part of an employer's gross receipts. In *Reich v. Priba Corp.*, mandatory fees paid to exotic dancers were treated differently depending on whether they were paid with cash or by credit card—employees kept the entire amount if paid in cash but the employer retained a twenty percent processing fee for payments made by credit card or voucher. 890 F. Supp. 586, 594–95 (N.D. Tex. 1995). The court concluded that the mandatory fees were not service charges because only a portion of them were retained by the employer and subsequently recorded as part

of the its gross receipts. *Id.* at 595 ("The fact that all of the table dance fees are not reported as gross receipts is fatal to [Defendant's] claim that the tips are more properly classified as wages."); *see Hart*, 967 F. Supp. 2d at 930 (holding that mandatory performance fees were not service charges because the employer "did not include in its gross receipts the $18 that a dancer received for redeeming each [credit card payment], although it did include in those receipts the $6 portion that was used to cover credit-card processing fees").

Here, Plaintiff has presented dispositive evidence that the mandatory gratuities did not "become part of" Canton Dockside's gross receipts and therefore do not qualify as service charges which may be used to offset Defendants' minimum wage and overtime pay obligations. Most significant in this regard is the fact that Defendants did in fact retain and properly record *some* mandatory gratuities as gross receipts of Canton Dockside, but did not do so for the majority of mandatory gratuities.[7] For instance, Defendants included some—*but not all*—mandatory gratuities in Canton Dockside's yearly P&L statements. Defendants' accountant testified that those statements included only a small percentage of the mandatory gratuities paid by credit card (i.e., those retained by Defendants in order to cover credit card processing fees) and none of the mandatory gratuities paid by cash.[8] Defendants subsequently used the figures from their P&L statements to determine their tax obligations to the government. Accordingly,

---

[7] Of course, the portion of mandatory gratuities retained by Defendants to cover credit card fees do not qualify as service charges either because they were not *distributed* by Defendants to Plaintiff and other tipped employees.

[8] At one point during his deposition Defendants' accountant suggested that the mandatory gratuities were "included" in Canton Dockside's gross receipts because every charge was "technically . . . included in the total sales, but . . . offset in the same account by what was paid out" to servers. (ECF No. 77, Ex. G, at 130.) However, even Defendants agree that gross receipts means the total amount of money received by a business "*before deductions.*" (*See* ECF No. 77 at 6 (emphasis added) (quoting *Gross Receipts*, Black's Law Dictionary (10th ed. 2014).) Notably, no other category of income (e.g., food, liquor, crabs, etc.) listed in Defendants' P&L statement is offset by a corresponding cost category *within* the gross sales calculation. Thus, rather than supporting Defendants' position, their accountant's testimony simply highlights the fact that mandatory gratuities were *not* treated like other forms of income received by the business.

Defendants reported some—*but not all*—mandatory gratuities on their Form 1065 Partnership Income Tax returns under the line item "Gross receipts or sales."  There is but one reasonable conclusion to draw from this evidence:  Defendants treated only a small portion of mandatory gratuities as business income that became part of their gross receipts.  A necessary corollary to this conclusion is that the vast majority of mandatory gratuities were not treated as income of the business and never became part of Defendants' gross receipts.  Defendants' failure to record all mandatory gratuities as part of Canton Dockside's gross receipts is "fatal to [their] claim that the [charges] are more properly classified as wages."  *Priba Corp.*, 890 F. Supp. at 595; *see also Hart*, 967 F. Supp. 2d at 930.

Defendants fail to provide a single case that supports their position—i.e., that mandatory gratuities need not be reported and recorded as gross receipts for accounting and tax purposes in order to qualify as service charges.  And the evidence in the record that Defendants do rely on is simply insufficient to generate a genuine issue of material dispute.  For instance, Defendants point to evidence that they tracked and recorded all mandatory gratuities, including the amount received from customers and the amount retained by or paid out to employees.  Along the same lines, Defendants contend that mandatory gratuities were "accounted for" and were "included for withholding purposes and reported biweekly in pay stubs."[9]  (ECF No. 77 at 11.)  There is no dispute that Defendants recorded all mandatory gratuities and voluntary tips in DSSD reports and in a separate internal report labeled "Transaction Detail by Account," which was an aggregation of all the voluntary tips and mandatory gratuities received over the course of a given year.  However, the mere fact that Defendants maintained a record of the mandatory gratuities received

---

[9]      Plaintiff's biweekly pay stubs indicated the total amount of mandatory gratuities and voluntary tips he received in a given pay period in a single combined line item labeled "Tips Cash."  (ECF No. 71, Ex. 7, Heiserman Decl. at 14–28.)  Notably, mandatory gratuities and voluntary tips were categorized as "Reimb. & Other Payments," not as "Earnings."

by *employees* does not mean that those charges ever became part of *Defendants'* gross receipts—they did not. *See, e.g.*, *Gardner*, No. 2015 WL 7783556, at *20.

If anything, Defendants' evidence simply lends further support to Plaintiff's position. Every indication from the evidence on record is that mandatory gratuities were considered synonymous with voluntary tips. Indeed, Defendants' own accountant testified that mandatory gratuities and voluntary tips were treated *identically* for accounting purposes. (ECF No. 77, Ex. G, at 125.) In an attempt to avoid the obvious implication of this statement, Defendants contend that voluntary tips also became part of their gross receipts. But this contention, just like Defendants' analogous claim regarding mandatory gratuities, finds no support in the record. Moreover, the fact that Defendants recorded mandatory gratuities as if they were voluntary tips for employee tax withholding purposes, while simultaneously failing to record those same charges as part of Canton Dockside's gross receipts for tax purposes, clearly indicates that they were at all times viewed as income solely of the employee not the employer.

The only other rebuttal evidence presented by Defendants is the opinion of their expert, Anthony Pelura. Mr. Pelura issued a supplemental report in which he concluded that mandatory gratuities were included in Canton Dockside's gross receipts. Mr. Pelura's report contains two brief paragraphs addressing the gross receipts issue. According to the report, Mr. Pelura's analysis consisted of reviewing Defendant Hamilton's interrogatory answers and Defendants' accountant's deposition testimony. Based on this evidence, he concluded that Defendants' accounting of mandatory gratuities satisfied the definition of "gross receipts" provided to him by defense counsel. In particular, Mr. Pelura concluded that mandatory gratuities "were included as part of the total amounts received by the restaurant," and therefore became part of Canton Dockside's gross receipts "at the time they were commingled into the restaurants [sic] cash

registers or bank accounts." (ECF No. 77, Ex. N, Supplemental Report Regarding Calculation of Wages Paid to Kristofer Prusin by Canton's Pearls, LLC., at 2.)  Mr. Pelura also noted that "[t]he Daily System Sales Reports track these sums which are further detailed in Canton Dockside's Profit & Loss statements and related Transaction Detail." (*Id.*)

Preliminarily, the Court notes that Plaintiff has moved to exclude Mr. Pelura's report and testimony as inadmissible pursuant to Federal Rule of Evidence 702.   (ECF No. 93.) Defendants' have yet to respond to this motion; however, the Court need not delay its ruling on this account because Mr. Pelura's opinion has no bearing on Plaintiff's entitlement to summary judgment.  Assuming without deciding that Mr. Pelura qualifies as an expert and that his report is admissible, the Court concludes that his conclusory opinion does not give rise to a genuine issue of material fact.

As the Seventh Circuit has explained,

> [A] party cannot assure himself of a trial merely by trotting out in response to a motion for summary judgment his expert's naked conclusion about the ultimate issue . . . . To allow this would be to confuse admissibility with weight and to disregard the judge-crafted limitations on the admissibility of expert testimony. The fact that a party opposing summary judgment has some admissible evidence does not preclude summary judgment. We and other courts have so held with specific reference to an expert's conclusional statements . . . . The Federal Rules of Evidence permit "experts to present naked opinions," but "admissibility does not imply utility . . . . An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process," and his "naked opinion" does not preclude summary judgment . . . . To put this differently, an expert's opinion based on "unsupported assumptions" and "theoretical speculations" is no bar to summary judgment.

*Weigel v. Target Stores*, 122 F.3d 461, 469 (7th Cir. 1997).  Mr. Pelura's conclusion that mandatory gratuities became part of Defendants' gross receipts rests on nothing more than bare conclusions unsupported by the record or any analysis (expert or otherwise).  First, the report makes no attempt to independently analyze Defendants' accounting and tax records and identify

where and when mandatory gratuities were recorded as gross receipts.  Second, his assertion that mandatory gratuities were "further detailed in Canton Dockside's Profit & Loss statements," is flatly contradicted by the record.  It is undisputed that Defendants' P&L statements included only a small portion of the mandatory gratuities paid by customers.  Moreover, in reaching his conclusion he appears to simply rely on the same unpersuasive arguments advanced by Defendants.  For instance, using the definition of gross receipts supplied by Defendants' counsel, Mr. Pelura concludes that mandatory gratuities became part of Canton Dockside's gross receipts when they were "received by the restaurant and commingled with other income sources."  (ECF No. 77, Ex. N, at 2.)  But, also like Defendants, he ignores the fundamental nature of the gross receipts requirement—it imposes an inescapable recordkeeping burden on employers as a prerequisite to offsetting their minimum wage obligations with service charges.  *See McFeeley*, 825 F.3d at 246. [10]   In other words, the question is not whether the mandatory gratuities were received and held by Canton Dockside for some fleeting period of time, but rather, whether they were recorded in their entirety as *receipts of Canton Dockside*, before accounting for any deductions resulting from payment to employees.

The record evidence is clear:  Defendants considered only a small portion of mandatory gratuities to be business income—they retained those funds and recorded them as gross receipts.  Mr. Pelura's wholly conclusory opinion is fundamentally incompatible with this uncontroverted evidence and therefore is entitled to no weight.

---

[10]     In this regard, Defendants' treatment of mandatory gratuities is at odds with the policy goals behind the service charge provision of the DOL regulations.  By contrast, imposing a bright-line rule that mandatory gratuities be included in an employer's gross receipts for accounting and tax purposes is consistent with the goals of the FLSA.  One of the fundamental purposes behind the gross receipts requirement is to insure "that the employee is paid, *with mandatory deductions taken from the employee's wages*."  *Hart*, 967 F. Supp. at 929–30 (emphasis added).  "Requiring that service charges pass through the employer's gross receipts guarantees that the employer takes responsibility for its employees' wages, and effectively guarantees that such mandatory deductions are taken."  *Id.*  Because Defendants treated mandatory gratuities like tips and were given to Plaintiff and other servers on a nightly basis, Plaintiff's wages were frequently insufficient to cover mandatory deductions.

Accordingly, Plaintiff's motion for summary judgment on his minimum wage claims under the FLSA and MWHL will be GRANTED.

### B.  Counts II, III, & V:  FLSA and MWHL Minimum Wage Violations

Defendants do not dispute that Plaintiff worked overtime hours and that he was not compensated at a different rate for these hours.  Defendants contend, however, that Plaintiff is exempt from the FLSA's overtime wage requirements under the retail or service establishment exemption.  *See* 29 U.S.C. 207(i).  Plaintiff counters that Defendants waived this argument by admitting in response to an interrogatory that Plaintiff was not exempt from the minimum wage and overtime requirements of the FLSA.  And, even if not waived, Defendants' argument is valid only if the mandatory gratuities at issue qualify as service charges.

Section 207(i) of the FLSA provides that a retail or service establishment employer need not pay an employee an increased overtime wage if,

> (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title [i.e., the minimum wage provision], and

> (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services.

29 U.S.C. § 207(i).  In other words, an employer is exempt from the FLSA's overtime wage requirements for all employees who (1) receive more than half their compensation from *commissions* and (2) whose regular rate of pay, including commissions, is already at or above the overtime wage rate.[11]  According to DOL's interpretive guidance, "[a] service charge levied on its customers by an establishment (e.g., hotel, motel, or restaurant), for services rendered by

---

[11]      "The 'regular rate' under the Act is a rate per hour. . . .  The regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid."  29 C.F.R. § 778.109.  "Commissions (whether based on a percentage of total sales or of sales in excess of a specified amount, or on some other formula) are payments for hours worked and must be included in the regular rate."  29 C.F.R. § 778.117.

waiters, waitresses, or other such service employees . . ., may qualify as a commission." Department of Labor, Field Operations Handbook, 21h07 (2016).  "The employer bears the burden of establishing entitlement to the exemption, and courts construe the exemption narrowly against the employer."  *Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 333 (S.D.N.Y. 2010); *accord Lee v. Ethan Allen Retail, Inc.*, 651 F. Supp. 2d 1361, 1365 (N.D. Ga. 2009).

Defendants' argument that they are entitled to the exemption turns entirely on whether the mandatory gratuities they charged qualify as service charges under the FLSA.  If so, then the charges would also qualify as commissions and therefore *could* entitle Defendants to an exemption, *provided* Defendants could establish that the other requirements under § 207(i) are satisfied—i.e., that Plaintiff's regular rate of pay is at least one and one half times the minimum wage and more than half his compensation is derived from commissions (i.e., service charges). Of course, as discussed *supra*, the mandatory gratuities do not qualify as service charges under the FLSA.  An inevitable corollary to this conclusion is that Defendants' are not entitled to an exemption under § 207(i).[12]

Accordingly, Plaintiff's motion for summary judgment on his overtime wage claims under the FLSA and MWHL will be GRANTED.

### C.  Defendant Eric Hamilton's Individual Liability

Plaintiff named Eric Hamilton as an individual defendant and now moves for summary judgment on the grounds that Defendant Hamilton qualifies as an employer under the FLSA and MWHL.[13]  The FLSA treats as an employer "any person acting directly or indirectly in the

---

[12]      As a result of this conclusion the Court need not address Plaintiff's waiver argument.

[13]      Plaintiff does not argue—at least in his motion for summary judgment—that Defendant Hamilton qualifies as an employer under the MWPCL.  Accordingly, the Court's memorandum and order does not express any opinion on Defendant Hamilton's status under the MWPCL.  The Court does note, however, that the definition of employer under the MWPCL is "'narrower' than the definition of employer under the FLSA, in that it does not include individuals who act 'indirectly in the interest of an employer.'"  *Alvarez-Soto v. B. Frank Joy, LLC*, No. CV TDC-

interest of an employer in relation to an employee." 29 U.S.C. § 203(d).  "[I]t is well settled that

an *individual* may qualify as an employer and face liability under the FLSA."  *McFeeley v.*

*Jackson St. Entm't, LLC*, 47 F. Supp. 3d 260, 274 (D. Md. 2014), *aff'd*, 825 F.3d 235 (4th Cir.

2016).   The FLSA's provisions "should be broadly interpreted and applied to effectuate its

goals," *Purdham v. Fairfax Co. Sch. Bd.*, 637 F.3d 421, 427 (4th Cir. 2011), because it would

run "counter to the breadth of the statute and to the Congressional intent to impose a

qualification which permits an employer who exercises substantial control over a worker, but

whose hiring decisions occasionally may be subjected to a third party's veto, to escape

compliance with the Act."  *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984).

In determining whether an individual is an employer for purposes of the FLSA, "[t]he

overarching concern is whether [he] possessed the power to control the workers in question."

*Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999).  To answer this question,

courts consider the "economic reality" of that individual's status in the workplace.  *Gionfriddo*,

769 F. Supp. 2d at 890.  As this Court has previously explained,

> [a] consistent factor in cases from other circuits has been operational control over
> the individuals claiming to have been employees. The Second Circuit has noted
> the relevant factors to consider include "whether the alleged employer (1) had the
> power to hire and fire the employees, (2) supervised and controlled employee
> work schedules or conditions of employment, (3) determined the rate and method
> of payment, and (4) maintained employment records."

*Speert v. Proficio Mortgage Ventures, LLC*, Civ. No. JKB–10–718, 2011 WL 2417133, at *3 (D.

Md. June 11, 2011) (quoting *Herman*, 172 F.3d at 139); *accord Mould*, 37 F. Supp. 3d at 775.

None of the four factors is dispositive; rather, a court should consider the totality of

circumstances.  *Herman*, 172 F.3d at 139; *see also Roman v. Guapos III, Inc.*, 970 F. Supp. 2d

407, 413 (D. Md. 2013).  Courts also consider a number of other factors, "such as the person's

---

15-1120, 2017 WL 2731300, at *10 (D. Md. June 23, 2017) (quoting *Hall v. DIRECTV, LLC*, 846 F.3d 757, 775 n.10 (4th Cir. 2017)).

job description, his or her financial interest in the enterprise, and whether or not the individual

exercises control over the employment relationship." *Gionfriddo*, 769 F. Supp. 2d at 890.  To

qualify as an employer one need not monitor employees continuously, but instead his "[c]ontrol

may be restricted, or exercised only occasionally." *Herman*, 172 F.3d at 139.  This "economic

reality" test also determines whether a person is an employer pursuant to the MWHL.  *Newell v.*

*Runnels*, 967 A.2d 729, 770 (Md. 2009).

Three of the four factors weigh in favor of finding that Defendant Hamilton was an

employer.  First, it is undisputed that Defendant Hamilton had the power to hire and fire

employees.  (ECF No. 84, Ex. 2, Mitchell Corp. Designee Dep., at 53.)  Second, there is no

genuine dispute as to whether Defendant Hamilton supervised and controlled the conditions of

employment.  He was the general manager, he trained servers and other staff (including

Plaintiff), he set standards of conduct, and he disciplined employees when they violated those

standards.  (*Id.*; ECF No. 77, Ex. A, at 137–41.)  Third, Defendant Hamilton determined the rate

and method of payment, including his own salary.  (ECF No. 71. Ex. 8, at 25; ECF No. 77, Ex.

A, at 76–81.))  Finally, while Defendant Hamilton did not maintain employment records, this

factor alone is insufficient to undercut the plethora of other evidence showing his overarching

"power to control the workers in question." *Herman*, 172 F.3d at 139.  Moreover, looking

beyond the four *Herman* factors, it is significant that Defendant Hamilton was a part owner of

the restaurant.  In this regard, he was not just any general manager, he had a personal ownership

stake in the restaurant.

Defendant Hamilton contends that he was not Plaintiff's employer because he "had no

actual authority or operational control" and only his father, Dr. Hamilton, had "full power" over

personnel matters according to the operating agreement for Canton's Pearls LLC.  (ECF No. 77

at 20.)  This argument, however, ignores the economic *reality* of Defendant Hamilton's status in the workplace.  The key question is not what the Operating Agreement said about how the restaurant would be managed, but how it was in fact managed.  Here, the undisputed facts reveal that Defendant Hamilton exercised substantial control over Canton Dockside's employees. Indeed, Defendants' corporate designee conceded as much when he testified as follows regarding Defendant Hamilton's role:

> Q. All right. What does the general manager do?
>
> A. Well, handles paying most of our bills, BGE and that kind of stuff, deals with our accountant regarding keeping up on internal P & L and the accountant keeps one. On a weekly basis, they are making sure the numbers are matching up and then they oversee the rest of the management team.
>
> Q. They have full authority to direct and control employees performing work in the restaurant, correct?
>
> A. Correct.
>
> Q. I mean the general manager is the boss, right?
>
> A. Correct.
>
> Q. And he has the authority to hire and fire?
>
> A. Correct.
>
> Q. And the authority to discipline?
>
> A. Correct.
>
> Q. And he has the authority to . . . change wage scales?
>
> A. To give, especially non-tipped employees raises, yes absolutely.

(ECF No. 84, Ex. 2, at 52–53.)  Defendant Hamilton cannot now avoid this testimony simply by arguing that these same facts are in dispute.[14]  Any such dispute is not *genuine*.

Defendant Hamilton also contends that "Plaintiff's pay structure was set by Dr. Hamilton, and subject to Dr. Hamilton's discretion" and "Defendant Hamilton's own salary was subject to Dr. Hamilton's discretion."  (ECF No. 77 at 20.)  He provides no support for these conclusions, however, and the facts in the record reveal the opposite to be true.  Dr. Hamilton testified that although he technically had authority to adjust employees' pay, he never exercised it and in fact was unaware of what anyone was being paid.

> Q.  Now, in addition to having the authority to make personnel decisions if you elected to do so you had the authority to alter or adjust employee compensation, correct?
>
> A.  If you're asking me if I had the authority I would say, yes. Did I ever exercise it, no, it wasn't in my domain of interest.
>
> Q.  So, you didn't know what your son was being paid in terms of a salary?
>
> A.  To be honest with you, no. Although, I do think he raised himself from time to time without me knowing. I really don't know.
>
> Q.  What about Mr. Mitchell, did you know what he made?
>
> A.  No.
>
> Q.  Rosa Gargano?
>
> A.  No. Although, Rosa, I do think they all had liberal salary increases outside of my knowledge.
>
> Q.  When you say salary increases you're talking about formal salary adjustments, correct?
>
> A.  I could say yes.

---

[14]    Defendants' accountant also testified that Defendant Hamilton was the decision maker with regard to labor issues.  (ECF No. 77, Ex. E, at 59 (Q. [D]id you ever have any conversations with anyone at Canton Dockside regarding any kind of labor expenses? A.Yes. Q. [W]ho did you speak to? A. Typically Eric.).)

(ECF No. 71. Ex. 8, at 25.)   Thus, although Dr. Hamilton had actual authority over employees pursuant to the operating agreement, the evidence in the record reveals that it was Defendant Hamilton who actually *exercised* authority over employees.[15]

Given the FLSA's expansive definition of employer, the undisputed facts—even viewed in the light most favorable to Defendant Hamilton—establish that Defendant Hamilton was Plaintiff's employer for purposes of the FLSA and MWHL.   Accordingly, Plaintiff's motion for summary judgment will be GRANTED insofar as it seeks to hold Defendant Hamilton individually liable for any potential violations of the FLSA and MWHL.[16]

### D. Damages

Plaintiff seeks $19,165.06 in unpaid minimum and overtime wage plus and equal amount in liquidated damages.   Defendants contend that Plaintiff is not entitled to liquidated damages because "there was no FLSA overtime wage violation."[17]   (ECF No. 77 at 15.)   Alternatively, Defendants contend that they "acted in good faith and had reasonable grounds to believe Plaintiff was properly paid" pursuant to the § 207(i) retail and service establishment exemption for overtime pay.   (*Id.*)

---

[15]      Defendant Hamilton also contends that he was not an employer because he did not personally set work schedules or handle payroll.  However, an individual need not handle all of the day-to-day minutia of running an establishment in order to qualify as an employer.  Rather, his "[c]ontrol may be restricted, or exercised only occasionally."  *Herman*, 172 F.3d at 139.

[16]      Defendant Hamilton also argues that he was not Plaintiff's employer because he "ceased having daily involvement in the operations of Canton Dockside after his employment as in-store manager with Canton Dockside ended in May 2015."  (ECF No. 77 at 21.)  This, of course, has no impact on Defendant Hamilton's status as an employer during his tenure as general manager, which included the vast majority of Plaintiff's time at Canton Dockside.  However, to the extent that Defendant Hamilton simply seeks to avoid liability for any potential FLSA and MWHL violations that occurred *after* he resigned from Canton Dockside, the Court agrees that he was no longer Plaintiff's employer as of his resignation in May 2015.  Defendant Hamilton's five percent ownership stake in Canton's Pearls LLC, standing alone, is insufficient to qualify him as an employer under the FLSA and the MWHL.

[17]      Defendants do not assert a good faith defense to Plaintiff's minimum wage claims.  The Court assumes then that Defendants concede that Plaintiff is entitled to liquidated damages for his minimum wage claims.  *See, e.g.*, *Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1246–47 (D. Md. 1997) (noting that a party's failure to respond to arguments in a summary judgment motion may constitute waiver).  In any event, any such claim would fail on the merits for the same reasons provided *infra* in regard to Defendants' liability under the overtime pay provisions of the FLSA.

### 1. *Liquidated Damages*

An employer who violates the FLSA's minimum wage or overtime pay provisions "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).  Double damages are the norm.  *See, e.g.*, *Mayhew v. Wells*, 125 F.3d 216, 220 (4th Cir. 1997).  A court "may, in its sound discretion," 29 U.S.C. § 260, award less than double damages only if the employer acted "'in good faith and . . . had reasonable grounds for believing that his act or omission was not a violation' of the FLSA." *Id.* (quoting 29 U.S.C. § 260.).  The employer bears the "plain and substantial burden" of persuading the court that the "failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict." *Id.* (quoting *Brinkley–Obu v. Hughes Training, Inc.*, 36 F.3d 336, 357 (4th Cir. 1994)); *see Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997) ("The burden, under 29 U.S.C. § 260, is a difficult one to meet, however, and [d]ouble damages are the norm, single damages the exception . . . ." (alterations in original) (internal quotations omitted)).

"[A]n employer may not simply remain blissfully ignorant of FLSA requirements" and then claim good faith.  *Burnley v. Short*, 730 F.2d 136, 140 (4th Cir. 1984).  Rather, "good faith 'requires that an employer first take active steps to ascertain the dictates of the FLSA and then move to comply with them.'"  *Lockwood v. Prince George's Cty.*, 217 F.3d 839, 2000 WL 864220, at *6 (4th Cir. June 29, 2000) (unpublished table decision ) (quoting *S. New England Telecomms. Corp.*, 121 F.3d at 71).

Here, Defendants make little attempt to meet their burden to show that they acted in good faith or had any reasonable ground for believing that they were in compliance with the FLSA.

26

Instead, Defendants lump almost all of their eggs in the liability basket, contending that liquidated damages are inappropriate because Plaintiff has not shown a violation of the FLSA. (*See, e.g.*, ECF No. 77 at 15 ("Because there was no FLSA overtime wage violation, the court cannot award liquidated damages.").)  The Court, however, rejects this argument as explained *supra*.

The Court's ruling that Defendants did not in fact qualify for an exemption to overtime pay under § 207(i), of course, is not alone fatal to their argument that they reasonably believed they were entitled to this exemption.  However, Defendants point to no evidence in the record that supports their argument.  Indeed, the record reveals the opposite.  Mr. Mitchell, the co-manager of Canton Dockside, and the individual responsible for payroll, testified that his belief that Canton Dockside was paying tipped employees properly "had nothing to do with whether servers were receiving service charges or mandatory gratuities."  (ECF 71, Ex. 4, at 32–33.)  The record reveals that Defendants were wholly ignorant of the FLSA's most basic requirements and took no steps to inform themselves of their obligations.  Defendants may not now recast their "ostrichlike attitude of self-delusion," *Burnley*, 730 F.2d at 140, as a good faith attempt at compliance with the FLSA.

### 2.  Damages Calculations

Plaintiff's expert submitted a report concluding that Plaintiff is owed 16,713.04 in unpaid minimum wages and $2,452.02 in unpaid overtime compensation, for a total of $19,165.06. With liquidated damages Plaintiff seeks a total recovery of $38,330.12.  Defendants do not challenge Plaintiff's expert's calculation of the wages owed to him.

"In order to calculate damages, 'the Court . . . may rely on affidavits or other evidentiary documents in the record to determine the amount of damages.'"  *Vanegas v. Diaz Granados,*

*Inc.*, No. PWG-15-2298, 2017 WL 345855, at *3 (D. Md. Jan. 24, 2017) (quoting *Quiroz v. Wilhelm Commercial Builders, Inc.*, No. WGC-10-2016, 2011 WL 5826677, at *2 (D. Md. Nov. 17, 2011)).  Plaintiff asserts multiple theories of recovery in his complaint and motion for summary judgment (e.g., FLSA, MWHL, and MWPCL), however, he may not recover for the same violative conduct under more than one theory.  *See id.* ("[Plaintiff] only may recover an amount of regular damages equivalent to the minimum and overtime wages they establish that they are owed; they cannot recover three times that amount by recovering under the FLSA, MWHL, and MWPCL."); *see also McFeeley v. Jackson St. Entm't, LLC*, No. CIV.A. DKC 12-1019, 2015 WL 570303, at *1 (D. Md. Feb. 10, 2015) ("[A] party may not recover twice for one injury, even if the party asserts multiple, consistent theories of recovery.  Therefore, Plaintiffs can only recover damages for unpaid wages under *either* the FLSA or the MWHL[,] but not under both statutes." (alteration in original) (internal quotations and citations omitted)).

Although the FLSA and MWHL are substantively indistinguishable, they do contain minor but important distinctions.  First, the MWHL provides for a three-year statute of limitations, whereas the FLSA provides for a two-year statute of limitations absent a showing that the defendant's violation was willful.[18]  Second, the MWHL did not provide for liquidated damages prior to July 1, 2014, which was in the middle of Plaintiff's employment with Defendants.  *See, e.g.*, *Cornish v. Deli Mgmt., Inc.*, No. CV WMN-16-672, 2016 WL 5934077, at *5 (D. Md. Oct. 12, 2016).  The MWHL's liquidated damages provision does "not apply retroactively." *McFeeley*, 2015 WL 570303, at *1 n.2.

---

[18]   This Court previously found that Defendants acted willfully with regard to their violations of the FLSA's overtime wage provisions but not their violations of the Act's minimum wage provisions.  (ECF No. 90, Order.) Thus, Plaintiff may recover up to three years of unpaid overtime wages but only two years of unpaid minimum wages.

Plaintiff has presented an expert report indicating that he is entitled to $19,165.06 and he seeks an equal amount in liquidated damages.  Defendants do not contest Plaintiff's *calculation* of damages.  Although Defendants' expert arrived at a different damages figure, his calculations were premised on counting mandatory gratuities as service charges used to offset Defendants' overtime wage obligations.  The Court, however, has concluded that Defendants may not use mandatory gratuities to offset their liability under the FLSA and MWHL.

That said, Plaintiff appears to improperly seek recovery under multiple theories of liability. According to his motion for summary judgment, Plaintiff seeks an award of liquidated damages "under the FLSA."  (ECF No. 71, at 22.)  However, Plaintiff's damages calculations in fact combine the best features (for Plaintiff) of the FLSA and MWHL.   For instance, Plaintiff seeks liquidated damages for all of his unpaid minimum and overtime wages, yet only the FLSA provided for such damages during the entirety of Plaintiff's employment.  This would not be a problem if Plaintiff sought recovery under only the FLSA as he claims to, yet his expert's calculations tell a different story.   First, Plaintiff's expert used the Maryland state minimum wage figures, which were greater than their federal counterpart for a portion of the relevant time period.  Second, the expert used a three-year statute of limitations to calculate Plaintiff's unpaid overtime and minimum wage, again apparently relying on the MWHL.  Yet, the Court has held that Plaintiff is only entitled to recover for two years on his FLSA minimum wage claims.  Thus, Plaintiff's damages calculations are clearly inaccurate.[19]

---

[19]     The issue is further confused by Plaintiff's MWPCL claim which remains lurking in the background.  In his motion for summary judgment, Plaintiff states that he is not seeking recovery under the MWPCL for any potential violation of the statute because his entitlement to treble damages under the MWPCL is "quintessentially a matter for the trier of fact."  (ECF No. 71 at 2.)  It is unclear whether Plaintiff is abandoning this claim or under the misimpression that he may still recover under the MWPCL for the same violation that entitles him to recover under the FLSA or MWHL—he may not.  Plaintiff must elect one theory of recovery.  *See, e.g.*, *McFeeley*, 2015 WL 570303, at *1.

In short, there remains a genuine dispute of material fact regarding Plaintiff's proper measure of damages.   Accordingly, Plaintiff's request for an award of $38,330.12 will be DENIED.

### IV.  *Conclusion*

For the foregoing reasons, an Order shall enter GRANTING IN PART and DENYING IN PART Plaintiff's Motion for Partial Summary Judgment (ECF No. 71).

DATED this 6th day of November, 2017.


BY THE COURT:


_____/s/_____
James K. Bredar
Chief Judge